**BRUNSWICK CORPORATION, a Delaware corporation, Plaintiff-Appellant,**

**v.**

**RIEGEL TEXTILE CORPORATION, a Delaware corporation, Defendant-Appellee.**

No. 84–1334.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 19, 1984.

Decided Dec. 19, 1984.

Rehearing and Rehearing En Banc Denied Jan. 18, 1985.

Erwin C. Heininger, Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellant.

J.D. Fleming, Sutherland, Asbill & Brennan, Atlanta, Ga., for defendant-appellee.

Before WOOD and POSNER, Circuit Judges, and CAMPBELL, Senior District Judge.*

POSNER, Circuit Judge.

Brunswick Corporation appeals from the dismissal, on the pleadings, of its antitrust suit against Riegel Textile Corporation. 578 F.Supp. 893 (N.D.Ill.1983). The appeal requires us to consider aspects of the relationship between patent and antitrust law.

The complaint alleges that in 1967 Brunswick invented a new process for making "antistatic yarn," which is used to make garments worn in hospital operating rooms and other areas where there are volatile gases that could be ignited by static electricity. Brunswick, which is not itself a textile manufacturer, disclosed its invention to Riegel, which is. Riegel promised to keep the invention secret. In April 1970 Brunswick applied for a patent on the new process and in August Riegel did likewise—in breach of its agreement with Brunswick. (Riegel denies that this was a breach, but as Brunswick has been given no chance to substantiate the allegations of its complaint we must treat them as true for purposes of this appeal.) Without considering Brunswick's application the Patent Office issued a patent to Riegel in 1972. The Patent Office discovered the Brunswick application in 1973, and in 1975 instituted a patent-interference proceeding to determine priority of invention between Riegel and Brunswick. See 35 U.S.C. § 135; 1 Rosenberg, Patent Law Fundamentals § 10.02 (2d ed. 1984). That proceeding was still pending before the Patent Office when Brunswick brought this lawsuit in 1982, but since then the Patent Office has held that although Brunswick indeed invented the process first, its patent application was invalid. Brunswick has challenged this ruling in another lawsuit in the Northern District of Illinois, and it has also sued Riegel in an Illinois state court for unfair competition.

■ Brunswick's complaint in this case is that by procuring a patent by fraud and then defending the patent's validity groundlessly in the patent-interference proceeding, Riegel monopolized the production of antistatic yarn in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. The complaint also describes Riegel's misconduct as an attempt to monopolize and as a conspiracy (with Riegel's agents and employees) to monopolize, which are also forbidden by section 2, except that a conspiracy between a corporation and its employees is not actionable under antitrust law. *University Life Ins. Co. v. Unimarc Ltd.*, 699 F.2d 846, 852 (7th Cir.1983). The district court dismissed the suit on alternative grounds: the complaint fails to state an antitrust cause of action; the suit is barred by the antitrust statute of limitations.

■ Getting a patent by means of a fraud on the Patent Office can, but does not always, violate section 2 of the Sherman Act. See, e.g., *Walker Process Equipment, Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *United States v. Singer Mfg. Co.*, 374 U.S. 174, 196–97, 83 S.Ct. 1773, 1784–85, 10 L.Ed.2d 823 (1963); *American Cyanamid Co. v. FTC*, 363 F.2d 757, 770–71 (6th Cir.1966); see generally 3 Areeda & Turner, Antitrust Law ¶¶ 707a–b, d, f (1978). A patent entitles the patentee to prevent others from making or selling the patented product or, as here, using the patented production process, and he may be able to use this legal right to restrict competition. If antistatic yarn cannot be produced efficiently other than by using Riegel's patented process, Riegel may be able to exclude competition in the sale of such yarn, in which event it may have "monopoly power"—the "power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*,

---

* Hon. William J. Campbell of the Northern Dis-   trict of Illinois, sitting by designation.

351 U.S. 377, 391–92, 76 S.Ct. 994, 1004–05, 100 L.Ed. 1264 (1956) (plurality opinion). And to create (or attempt to create, or conspire to create) monopoly power by improper means is to monopolize (or attempt to monopolize, or conspire to monopolize) within the meaning of section 2 of the Sherman Act. See, e.g., *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966).

■ But "may" is not "does"; and for a patent fraud actually to create or threaten to create monopoly power, and hence violate section 2, three conditions must be satisfied besides proof that the defendant obtained a patent by fraud:

1. The patent must dominate a real market. See *Walker Process Equipment, Inc. v. Food Machinery & Chem. Corp.*, *supra*, 382 U.S. at 177–78, 86 S.Ct. at 350–51; *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1366–67 (Fed.Cir.1984); *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993 n. 13 (9th Cir.1979). Although the Patent Office will not issue a patent on an invention that has no apparent utility, the invention need not have any commercial value at all (other products or processes may be superior substitutes), and it certainly need not have enough value to enable the patentee to drive all or most substitutes from the market. If a patent has no significant impact in the marketplace, the circumstances of its issuance cannot have any antitrust significance.

2. The invention sought to be patented must not be patentable. If the invention is patentable, it does not matter from an antitrust standpoint what skullduggery the defendant may have used to get the patent issued or transferred to him. The power over price that patent rights confer is lawful, and is no greater than it otherwise would be just because the person exercising the rights is not the one entitled by law to do so. The distinction between a fraud that leads the Patent Office to issue a patent on an unpatentable invention (as in a case where the patent applicant concealed from the Patent Office the fact that the invention already was in the public domain) and one that merely operates to take the patent opportunity away from the real inventor (who but for the fraud would have gotten a valid patent that would have yielded him a royalty measured by the monopoly power that the patent conferred) is supported by analogy to cases holding that fraud on the Patent Office, to be actionable as patent fraud, must be material in the sense that the patent would not have been issued but for the misconduct. See, e.g., *E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1274 (8th Cir.1980); *Norton v. Curtiss*, 433 F.2d 779, 794 (C.C. P.A.1970). Equally, for a fraud to be material in an antitrust sense the plaintiff must show that but for the fraud no patent would have been issued to anyone. If a patent would have been issued to someone, the fraud could but have diverted market power from the one who had the right to possess and exploit it to someone else.

3. The patent must have some colorable validity, conferred for example by the patentee's efforts to enforce it by bringing patent-infringement suits. Indeed, some formulations of the antitrust offense of patent fraud make it seem that the offense is not the fraudulent procuring of a patent in circumstances that create monopoly power but the bringing of groundless suits for patent infringement. See, e.g., *Handgards, Inc. v. Ethicon, Inc.*, *supra*, 601 F.2d at 993 and n. 13. This metamorphosis is natural because most patent-antitrust claims are asserted as counterclaims to patent-infringement suits and because the abusive prosecution of such suits could violate the antitrust laws even if the patent had not been obtained by fraud. See, e.g., *id.* at 994. But enforcement actions are not a *sine qua non* of monopolizing by patent fraud. Since a patent known to the trade to be invalid will not discourage competitors from making the patented product or using the patented process, and so will not confer monopoly power, suing an infringer is some evidence that the patent has (or at least the patentee is seeking to clothe it with) some colorable validity that

might deter competitors. But it is not indispensable evidence; the concern of section 2 is with exclusion of competition, not with the particular means of exclusion. Indeed, one might argue that just by virtue of being issued, a patent would have some apparent validity and that no more should be necessary. But this would go too far the other way. Since patents are issued in ex parte proceedings, and since by hypothesis the patent applicant had to use fraud to persuade the Patent Office to issue the patent, the patent might not fool anybody in the defendant's market.

Let us see whether these three conditions are satisfied by the complaint in this case. Right off the bat there is a problem with condition (1), as Brunswick's complaint does not allege that the business of making and selling antistatic yarn is an economically meaningful market. However, facts are pleaded that allow an inference that antistatic yarn probably does not have good substitutes, in which event its sole producer could maintain its price significantly above the cost of production and sale.

■ There is a serious problem, however, with condition (2). Far from alleging that the process for making antistatic yarn that Riegel patented is not patentable, the complaint alleges that it is. Brunswick's only objection is to the patentee's identity; it thinks that it rather than Riegel should be the patentee. But as we have already suggested, to say that a patent should have been issued because the invention covered by it is patentable, but should have been issued to a different person and would have been but for fraud (the breach of the promise to Brunswick not to disclose its invention), is to say in effect that the patentee stole the patent from its rightful owner; and stealing a valid patent is not at all the same thing, from an antitrust standpoint, as obtaining an invalid patent. Until unmasked in an infringement or cancellation or other proceeding, a patent on an unpatentable invention may create a monopoly by discouraging (through litigation or other means) others from making the

patented product, just as a valid patent may, but the monopoly that such a patent creates is illegal, and hence actionable under antitrust law. The theft of a perfectly valid patent, in contrast, creates no monopoly power; it merely shifts a lawful monopoly into different hands. This has no antitrust significance, although it hurts the lawful owner of the monopoly power.

■ The purpose of the antitrust laws as it is understood in the modern cases is to preserve the health of the competitive process—which means, so far as a case such as this is concerned, to discourage practices that make it hard for consumers to buy at competitive prices—rather than to promote the welfare of particular competitors. This point was implicit in the famous dictum of *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962), that antitrust law (the Court was speaking of section 7 of the Clayton Act, but the point has been understood to be general) is concerned "with the protection of *competition,* not *competitors* " (emphasis in original), and has been repeated with growing emphasis in recent years by this and other courts. See, e.g., *Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 655 (7th Cir. 1984), and cases cited there. True, competitors as well as consumers still have standing to complain about antitrust violations, but that is because competitors are thought to be effective (maybe indispensable) surrogates for the many consumers who do not realize they are the victims of monopolistic practices, or if they do may lack incentives to bring suit because the harm to an individual consumer may be tiny even though the aggregate harm is immense. See Landes, *Optimal Sanctions for Antitrust Violations,* 50 U.Chi.L.Rev. 652, 671–72 (1983); cf. *In re Industrial Gas Antitrust Litigation,* 681 F.2d 514, 520 (7th Cir.1982). If no consumer interest can be discerned even remotely in a suit brought by a competitor—if, as here, a victory for the competitor can confer no benefit, certain or probable, present or future, on consumers—a court is entitled to question whether a violation of antitrust law is being

charged. See generally Easterbrook, *The Limits of Antitrust*, 63 Tex.L.Rev. 1, 33–39 (1984). If injury to a competitor, caused by wrongful conduct, were enough to bring the antitrust laws into play, the whole state tort law of unfair competition would be absorbed into federal antitrust law; it has not been: "unfair competition, as such, does not violate the antitrust laws." *Sutliff, Inc. v. Donovan Cos., supra,* 727 F.2d at 655; see also *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107–08 (7th Cir.1984); *Havoco of. America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 554–59 (7th Cir.1980).

We cannot find the consumer interest in this case. Brunswick is complaining not because Riegel is gouging the consumer by charging a monopoly price for antistatic yarn, but because Riegel took away a monopoly that rightfully belonged to Brunswick as the real inventor. It is true that when Riegel got its patent Brunswick's patent application was still pending. But there is no suggestion that any other competitors were in the picture. If Riegel had not committed the alleged fraud, Brunswick would have had the whole field to itself—would have had the monopoly of antistatic yarn that it accuses Riegel of having stolen. This would be true even if Brunswick had not tried to get a patent on its process for making antistatic yarn. It still could, and as a rational profit-maximizer presumably would, have tried to license the invention as a trade secret; and a trade secret known only to, and licensed by, one firm may create as much monopoly power as a patent (more, even, if the secret can be kept for more than 17 years).

The nature of the remedy sought in an antitrust case is often, and here, an important clue to the soundness of the antitrust claim. Brunswick is asking, as a main part of the remedy, for an order transferring ownership of the patent from Riegel to itself. There is no contention that in asking for this Brunswick is motivated by altruism. It wants to make as much money as it can from the patent—as much as Riegel made, or, if possible, even more. There is nothing discreditable in this ambi-

tion but we do not see how consumers can benefit from its achievement. The nature of the remedy sought shows that Brunswick, far from contesting the propriety of a patent monopoly of antistatic yarn, makes that propriety the very foundation for the judicial relief that it seeks.

It makes no difference that Brunswick, which as we said is not a textile manufacturer, says that if it owned the patent it would license production to several manufacturers. There would then be more manufacturers of antistatic yarn than there are today, but there would not be more competition if the "competitors" were constrained by the terms of the patent license to charge the monopoly price. And they would be. As a rational profit-maximizer Brunswick would charge its licensees a royalty designed to extract from them all the monopoly profits that the patent made possible; and the licensees would raise their prices to consumers to cover the royalty expense. The price to the consumer would be the same as it is, today, with Riegel the only seller in the market.

■ It is not a purpose of antitrust law to confer patents or to resolve disputes between rival applicants for a patent. From the standpoint of antitrust law, concerned as it is with consumer welfare, it is a matter of indifference whether Riegel or Brunswick exploits a monopoly of antistatic yarn. Cf. *Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Cos.,* 682 F.2d 660, 665 (7th Cir.1982). Indeed, if anything, competitive pricing is more likely if Brunswick loses this suit than if it wins it. If Brunswick is confident that Riegel's patent is invalid, it can go into the antistatic-yarn business itself, with little fear of being held liable for patent infringement; and by entering, it will inject some competition into that market for the first time. Brunswick argues that it could not induce textile manufacturers to produce antistatic yarn under license from it since they would fear that Riegel would sue them, however baselessly, for patent infringement. But when a patentee (or, as in this case, a

patent applicant) licenses his patent to other firms, he typically agrees to indemnify them for any costs incurred in patent-infringement suits brought against them. Brunswick, a large corporation, can afford to indemnify its licensees and would promise to do so if it really believed that it and not Riegel was the lawful owner of the patent.

Our analysis is supported by a more illustrious case bearing Brunswick's name— *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), which held that an antitrust plaintiff cannot prevail merely by showing that the defendant violated the antitrust laws and the violation hurt the plaintiff; he must also show that the injury is the sort of thing the antitrust laws seek to discourage, such as price above the competitive level and output below it. It would seem to follow that if a form of wrongdoing (stealing a patentable process) cannot cause antitrust injury to anyone, because it has no tendency to raise prices or reduce output or do anything else that hurts consumer or other interests protected by the antitrust laws, it does not violate those laws at all. It is then not a matter of the case having been brought by the wrong plaintiff, as in *Brunswick*, but of there being no possible plaintiff because the defendant's conduct has no tendency to injure anyone intended to be benefited by the antitrust laws. The Fifth Circuit so held recently in a case where the plaintiff had complained that the defendant was preventing it from exploiting a natural monopoly of the resale distribution of electricity. *Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 353 (5th Cir.1980); see also *Mishler v. St. Anthony's Hospital Systems*, 694 F.2d 1225, 1228 (10th Cir. 1981).

■ The third condition for a patent fraud to violate section 2 of the Sherman Act—that the defendant has made efforts to give the color of validity to his patent on an unpatentable invention—cannot be met in a case where the plaintiff himself asserts that the underlying invention is patentable. This reinforces our conclusion that the complaint states no antitrust cause of action.

But in so concluding we have not considered any events after Riegel received the patent in 1972, though Brunswick argues that Riegel's subsequent conduct in defending itself in the patent-interference proceeding also violated section 2. This argument is also a cornerstone of Brunswick's challenge to the district court's alternative holding that Riegel's action was barred by the statute of limitations—a holding we shall now consider in part for the light it may cast on the more fundamental issue of the sufficiency of the complaint.

■ Unless tolled for one reason or another, the four-year antitrust statute of limitations in section 4B of the Clayton Act, 15 U.S.C. § 15B, expired in 1976 on any cause of action that Brunswick might have had by reason of Riegel's alleged fraud, because the fraud had succeeded in 1972, when Riegel got its patent, yet this suit was not brought till 1982. Brunswick has abandoned its argument that the statute of limitations was tolled because of fraudulent concealment, but makes other arguments for extending the statute. One is that the Patent Office has primary jurisdiction over any dispute over patent validity, and that as a result the statute of limitations does not begin to run till its proceedings are final. Although this argument may seem to lead to the bizarre conclusion that Brunswick's suit is premature, because judicial review of the patent-interference proceeding is not yet complete, Brunswick was entitled to file this antitrust suit as a protective action so that if its primary-jurisdiction argument failed its suit would not be time-barred. And that is the spirit in which Brunswick filed; the only discovery it proposed to conduct before the patent-interference proceeding was resolved was deposing elderly witnesses who might die or whose memories might fade before the case was tried.

■ *Mt. Hood Stages, Inc. v. Greyhound Corp.*, 616 F.2d 394 (9th Cir.1980),

the case on which Brunswick relies for this ground for extending the statute of limitations, holds that the antitrust statute of limitations does not begin to run until the conclusion of any administrative proceedings that the plaintiff is required to pursue by the doctrine of primary-jurisdiction. This is a surprising holding because the doctrine of primary jurisdiction (as distinct from that of exhaustion of administrative remedies) ordinarily comes into play *after* suit is filed and the statute of limitations is thus stopped from running, when the defendant asks that the suit be stayed because a potentially controlling question is within an agency's exclusive jurisdiction to decide, at least in the first instance. See, e.g., *City of Peoria v. General Electric Cablevision Corp.*, 690 F.2d 116, 120–21 (7th Cir.1982). Mt. Hood complained that a competing bus company had tried to drive it out of business by buying up bus companies with which it had connecting routes and then cancelling the connections so that it would be isolated. Although the acquisitions had been approved by the Interstate Commerce Commission and by being approved had been immunized from an attack under the antitrust laws, Mt. Hood asked the Commission to rescind its approval on the ground that Greyhound had obtained it through misrepresentations; and it was only after the Commission accepted the petition and rescinded its earlier approval that Mt. Hood filed its antitrust suit. It could have sued before asking the Commission to rescind the original order, but had it done so Greyhound would have argued that the acquisitions were immune, Mt. Hood would have countered that the immunity rested on fraud, and the court would then (perhaps) have stayed the suit on the ground that the question whether the approval of the acquisitions had been fraudulently procured was within the primary jurisdiction of the ICC, requiring Mt. Hood to present its claim to the Commission before the court could resolve the issue of antitrust immunity.

To allow the statute of limitations to be tolled on the basis of a defense that might be raised if the suit were filed on time is unconventional; and although, since it was very likely that a dispositive issue would have to be fought out in the Commission before the court could act, it may have made little difference whether Mt. Hood brought the suit within four years and then interrupted it for a proceeding before the ICC, or waited till that proceeding was over before suing, it could have made some difference, as the facts of the present case show. The patent-interference proceeding began three years after Brunswick's cause of action arose, which means that the statute of limitations had one year left to run. But for *Mt. Hood*, Brunswick would have had to sue within another year, that is, while the patent-interference proceeding was going on. The suit would have been stayed but would have resumed immediately upon the conclusion of that proceeding. Under the principle of *Mt. Hood* (if applicable to patent-interference proceedings), Brunswick would have had a year to bring suit *after* the conclusion of the interference proceeding. Considering that agency proceedings can greatly prolong antitrust litigation when primary jurisdiction is invoked—especially since the agency proceedings are not considered complete for these purposes until judicial review of the agency's determination is complete, see, e.g., *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 306, 93 S.Ct. 573, 582, 34 L.Ed.2d 525 (1973)—we question the wisdom of allowing a plaintiff to wait for the unexpired portion of the statute of limitations to expire after the agency proceedings are complete before he sues, rather than suing if need be while those proceedings are going on and staying the suit till they have been completed.

But sound or unsound, the principle of *Mt. Hood* is not applicable to this case. It certainly would not apply if the priority of the conflicting patent applications, Brunswick's and Riegel's, were the only issue in the patent-interference proceeding, for that is not a potentially dispositive issue in the antitrust case. Brunswick's antitrust claim is that Riegel, by breaking its contract not to disclose Bruns-

wick's invention, defrauded Brunswick of its right to patent the process it had invented for producing antistatic yarn. Even if the Patent Office decided that Riegel's patent was valid, Riegel might still have committed a fraud against Brunswick by applying for the patent itself. Cf. *Hilborn v. Dann,* 546 F.2d 401, 403 (C.C.P.A.1976). True, the Patent Office might find, to the contrary, that Riegel's patent was invalid and Brunswick's patent application valid. And it might seem that if Brunswick could get all the relief it wanted from the Patent Office it ought not have to bring suit before it knew whether it had gotten that relief. But there was no way that Brunswick could obtain complete relief from the Patent Office; the Patent Office could not make Riegel compensate Brunswick for the money that Brunswick had lost because Riegel had gotten a patent first. Thus, if priority of invention were the only issue in the patent-interference proceeding, that proceeding could provide at best some partial and parallel relief to the antitrust suit but would not be a condition precedent to it (as in *Deltec, Inc. v. Laster,* 326 F.2d 443, 444 (6th Cir.1964) (per curiam)), or a complete substitute for it, or even a proceeding that "promises to be of material aid in resolving" a potentially dispositive issue, *Ricci v. Chicago Mercantile Exchange, supra,* 409 U.S. at 302, 93 S.Ct. at 580, such as the issue of antitrust immunity in *Ricci* and in *Mt. Hood.* The fact that Brunswick wanted to litigate the patent-interference proceeding to conclusion before actively litigating the present suit does not show that that proceeding "promise[d] to be of material aid in resolving" a potentially dispositive issue, but only that Brunswick had a preferred sequence for litigating its various claims (now pending in three different courts) against Riegel.

But all this assumes that priority is the only issue in a patent-interference proceeding, and we know from the fact that the Patent Office found that Brunswick's patent application was invalid that it is not. The Board of Patent Interferences is allowed to review a broad range of issues "ancillary" to priority. See 1 Rosenberg,

*supra,* § 10.02[5][c], at p. 10–47. And the validity of Brunswick's patent is, as Brunswick has framed its antitrust suit, a potentially dispositive issue in the antitrust suit, since that whole suit is bottomed on the claim that Riegel took from Brunswick a patent opportunity that rightfully belonged to it. However, this court has held recently that patent validity is not within the Patent Office's primary jurisdiction. See *Johnson & Johnson, Inc. v. Wallace A. Erickson & Co.,* 627 F.2d 57, 61–62 (7th Cir.1980). The validity of a patent is a question of law, which a court decides with some but not great deference to decisions of the Patent Office. *Johnson & Johnson* was not an antitrust case, but we think its teachings apply even more strongly to antitrust cases. These cases are already sufficiently protracted without our making them more so by adopting a new principle under which patent-antitrust cases could be delayed indefinitely for proceedings before the Patent Office. As for the issue of fraud, apparently that was never presented to the Patent Office as part of the interference proceeding; and we doubt whether the Patent Office would be interested in adjudicating a dispute arising not from anything done in Patent Office proceedings but from Riegel's agreement with Brunswick not to disclose Brunswick's invention.

Brunswick's separate argument that its damages were insufficiently definite to require it to bring suit back in 1972 when Riegel got its patent rests on *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338–42, 91 S.Ct. 795, 806–08, 28 L.Ed.2d 77 (1971), which held that if the victim's damages are too speculative to be computed at the time of the antitrust violation, the victim can (must, really) wait to sue until they become ascertainable. In *Zenith* itself, the calculation of damages at the time of the violation (or even of the trial) would have required "predict[ing] market conditions and the performance of one competitor in that market five to 10 years hence." *Id.* at 342, 91 S.Ct. at 808. Calculating Brunswick's damages back in

1972 would have required predicting Riegel's success in selling antistatic yarn.

But *Zenith* has not been understood to toll the antitrust statute of limitations in every case where the plaintiff is seeking damages for being excluded from a market the profitability of which will be revealed only in the fullness of time. See, e.g., *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 573 (4th Cir.1976); *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872, 885 (2d Cir.1971); *Landon v. Twentieth Century-Fox Film Corp.*, 384 F.Supp. 450, 459 (S.D.N.Y.1974). Exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs (which means, in this case, in 1972), even though, in the nature of things, the victim's losses lie mostly in the future. See, e.g., 2 Areeda & Turner, Antitrust Law 232–33 (1978). In some cases, such as *Zenith* itself, or our recent decision in *Ohio-Sealy Mattress Mfg. Co. v. Kaplan*, 745 F.2d 441, 450 (7th Cir.1984), the plaintiff may be able to show that his future losses were so speculative at the time of exclusion that a judge or jury would not have been allowed to award damages for those losses at that time, in which event the plaintiff may and indeed must wait to sue. (In *Kaplan*, to calculate damages would have required predicting how the defendants would resolve a number of legal questions that faced them; if the defendants answered them in a particular way, the anticompetitive activities would be discontinued and thus cease to hurt the plaintiff.) But unless special circumstances preclude, as excessively speculative, an award of damages based on predicted as distinct from realized losses due to the defendant's misconduct, the statute of limitations is not tolled simply in order to wait and see just how well the defendant does in the market from which he excluded the plaintiff. Otherwise it would be tolled indefinitely in a very large class of antitrust suits.

The *Zenith* principle is particularly out of place in this case; for the nature of Brunswick's complaint is such that it could have gotten complete compensation in a suit brought in 1972 with much less uncertainty than is usual in antitrust damage actions. Brunswick could and did ask for Riegel's profits from the sale of antistatic yarn up to the date of trial and for an assignment of Riegel's patent rights to it, which would have enabled Brunswick to obtain the future profits generated by the patent by licensing it to textile manufacturers—maybe to Riegel itself.

If the complaint can fairly be read to charge misconduct after 1972, when Riegel got its patent, this could provide another and better ground for tolling the statute of limitations, and also for finding in the later conduct some indication that a genuine antitrust violation, occurring within the limitations period, is being charged. But the only thing that happened after 1972 is that Riegel, when brought into the patent-interference proceeding initiated by the Patent Office, defended itself. Brunswick argues that in doing so Riegel engaged in exclusionary conduct that, when combined with the original fraud, establishes an antitrust violation that continued into the four-year limitations period that began in 1978; and it points out that if a continuing violation extends into the statutory period, the victim is entitled to complain about the whole violation, no matter how long ago it began (see, e.g., *Weber v. Consumers Digest, Inc.*, 440 F.2d 729, 731 (7th Cir.1971)) —a rule necessary to head off multiple suits growing out of the same events. But if, as we stated earlier, the original fraud was not an antitrust violation because it had no tendency to harm consumer interests, we do not see how Riegel's refusing to acknowledge that fraud in the patent-interference proceeding could be an antitrust violation; it might serve to perpetuate a fraud, but a fraud harmless to the interests protected by the antitrust laws.

Moreover, while harassing competitors by litigation that can fairly be described as malicious prosecution or abuse of process can violate the antitrust laws, see, e.g., *Grip-Pak, Inc. v. Illinois Tool Works,*

*Inc.*, 694 F.2d 466, 470–73 (7th Cir.1982), we are pointed to no case where simply defending oneself in a proceeding brought by another has been held to be actionable. If it were, the following bizarre sequence would be implied: A gets a patent; B, a rival inventor, sues A in state court for unfair competition in having acquired the patent by fraud; years later B brings an antitrust suit against A, charging that A's refusal to cave in in the state-court action brought by B was exclusionary conduct forbidden by the antitrust laws.

Although the patent-interference proceeding was not instituted by Brunswick, but by the Patent Office, this is a technical distinction. Brunswick was the moving party, really, because the patent-interference proceeding was started only after Brunswick, by referring to Riegel's patent in Patent Office filings made in connection with Brunswick's own patent application, made the interference starkly apparent to the Patent Office. See 1 Rosenberg, *supra*, § 10.02[3], at p. 1032. You cannot start a suit, as Brunswick in effect did here, and then sue the defendant for refusing to default.

· Brunswick argues, however, not only that Riegel should not have defended itself at all but also that in doing so Riegel falsified documents and engaged in other unethical conduct. We doubt that an antitrust case is the proper forum for deciding questions of legal ethics. But even if defending against a competitor's lawsuit could be (maybe because of the tactics employed) the kind of aggressive conduct that might in other circumstances violate the antitrust laws, it could not here, given our earlier point that all Brunswick is seeking is Riegel's profits plus the transfer of Riegel's patent to itself. Whoever owns the patent, the consumer will have to pay a royalty measured by the monopoly power conferred by the patent—provided the invention really is patentable, as Brunswick vigorously asserts it is.

AFFIRMED.

HARLINGTON WOOD, Jr., Circuit Judge, concurring.

I join in the result reached in so much of Judge Posner's opinion as holds that the alleged cause of action is barred by the statute of limitations. Judge Aspen's Memorandum Opinion and Order in the district court, *Brunswick Corp. v. Riegel Textile Corp.*, 578 F.Supp. 893 (N.D.Ill.1983), held that the cause of action was barred by the statute of limitations, 15 U.S.C. Section 15b, that no exception was applicable, and that there was no continuing antitrust violation to bring it within that statute. I would affirm on the basis of Judge Aspen's opinion. Therefore, although enlightening, I see no need for much of the antitrust-economic-patent discussion in Judge Posner's opinion.